**Audrey MEADOR, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 101–90.

Court of Criminal Appeals of Texas, En Banc.

June 26, 1991.

Odis R. Hill, Longview, for appellant.

Rob Foster, Atty., Pro Tem., Longview, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

BENAVIDES, Judge.

The appellant, Audrey Meador, was convicted by a jury of criminal solicitation of capital murder. See Tex. Penal Code Ann. § 15.03(a) & § 19.03(a)(3). The jury assessed punishment at life imprisonment and a $10,000.00 fine, which is within the proper range of punishment for a felony of the first degree. See Tex. Penal Code Ann. § 15.03(d)(1) & § 12.32. The Court of Appeals held the trial court erred when it admitted a taped telephone conversation into evidence because it contained inadmissible hearsay and, finding that the error was not harmless, reversed the conviction and remanded the case for a new trial. See *State v. Meador*, 811 S.W.2d 612 (Tex. App.–Tyler 1989). We granted the State's petition for discretionary review on the sole issue of whether the court of appeals erred when it held that a taped telephone conver-

sation was erroneously admitted into evidence because it failed to meet the requirements of Tex.R.Crim.Evid. 801(e)(2)(E). We will affirm the court of appeals.

The evidence reflects that Wayne Hutson was murdered the night of September 17, 1985 and law enforcement officers discovered his body on September 18, 1985 in the back of his own van which was parked on an isolated oil well field just outside Longview. He died from one gunshot wound to the chest.

The State's case was based on the theory that appellant paid two individuals, Ben Sheffield and Titus McKee, to kill Wayne Hutson. Appellant was to pay McKee and Sheffield $6,000. that they in turn would divide in payment for their respective roles in the offense. Sheffield's [1] role was to locate someone who would agree to be the "triggerman" and to see that the murder was carried out. Sheffield was an intermediary between appellant and McKee, who was the "triggerman," although appellant had spoken directly to McKee on occasion.

The first significant lead in the investigation of Hutson's murder case came from information provided by Ben Sheffield, in jail at that time on an unrelated delivery of controlled substances charge. Sheffield contacted Larry Ray Smith, Captain of the Criminal Investigation Division of the Gregg County Sheriff's Department, through an attorney and ultimately a statement was taken from Sheffield in which McKee was implicated in the murder of Hutson. The Gregg County District Attorney's office entered an agreement with Sheffield that he would receive a reduced sentence if he would furnish information that would lead to an arrest in the Hutson murder case but that all deals would be off if it was later found that Sheffield was involved in the murder. Sheffield told police that McKee killed Hutson but denied any involvement on his part. Titus McKee was arrested and indicted for the offense of capital murder for the death of Hutson based on the information supplied by Shef-

field. Sheffield testified against McKee at an examining trial held for McKee.

After spending five months in jail on capital murder charges and professing his innocence, McKee gave the police a written confession which implicated Sheffield and appellant. Although all parties concerned denied any agreement between the State and McKee, the charge against McKee was reduced from capital murder to murder after McKee gave his confession implicating the others.

The record shows that McKee's May 2, 1986 oral statements and his written confession provided the information which brought about appellant's arrest and her initial indictment for capital murder. The capital murder charge was then abandoned and appellant was indicted for solicitation of capital murder, for which offense she was convicted and is the subject of this appeal.

Sheffield, who was indicted for the capital murder of Hutson, did not testify at appellant's trial. As the court of appeals opinion correctly points out, the only direct testimony of appellant's alleged solicitation of McKee to kill Hutson for money came from the mouth of the accomplice witness, Titus McKee.[2]

At issue in this case is the admissibility of a taped telephone conversation between Sheffield and McKee which was admitted into evidence. On May 7, 1986 Larry Ray Smith, Captain of the Criminal Investigation Division of the Gregg County Sheriff's Department, set up a recorded telephone call where McKee would call Sheffield and engage in conversation that would hopefully implicate appellant. At this time McKee was in the custody of the Gregg County Sheriff and an inmate of the Gregg County Jail on charges of capital murder for the murder of Hutson. Smith testified to the circumstances surrounding the taping of the telephone conversation. Smith testified that on May 7, 1986 (7 months and twenty-two days *after* the murder) he attached a

---

1. Sheffield was an accomplice to the offense as a matter of law.

2. The trial court instructed the jury that Titus McKee was an accomplice witness, as a matter of law.

recording device to the telephone in his office. Present were McKee, Smith, Melinda Ellis and another law enforcement officer. Smith dialed the telephone number of Sheffield's brother for the purpose of getting Sheffield's telephone number. Melinda Ellis, another employee of the Gregg County Sheriff's Department, acted as a telephone operator to make it appear that the call was being made from the Gregg County Jail since all calls from inmates must be collect calls.

Sheffield, who happened to be at his brother's house at the time the call was made, picked up the phone. McKee proceeded to ask Sheffield if he would contact "the lady" to ask her if she would provide assistance in raising money for McKee's bond and attorney's fees. Sheffield's reply was "I don't know, I can check you know" and "I can check."[3] The State contends that "the lady" actually refers to appellant. There was testimony from Officer Smith and Officer Anderson that Sheffield was seen at the Oil Bowl (a bowling alley at which appellant worked) soon after this telephone conversation was taped, but was never actually seen talking with appellant.[4]

The Twelfth Court of Appeals held that the trial court erred in admitting the tape into evidence, over a timely objection, because the conversation did not qualify as a statement by a coconspirator during the course of the conspiracy and in furtherance thereof and therefore failed to meet the requirements of Rule 801(e)(2)(E), supra.

The question presented is whether this statement meets the requirements of Tex.R.Crim.Evid. 801(e)(2)(E), which provides: (e) a statement is not hearsay * * * * * (2) if the statement is offered against a party and is * * * (E) a statement by a co-conspirator of a party during

the course and in furtherance of the conspiracy. When two or more people take part in the commission of a felony, evidence of a conspiracy is admissible even though the substantive crime of conspiracy is not charged. See *Roy v. State*, 608 S.W.2d 645, 651 (Tex.Cr.App.1980). Moreover, the coconspirator exception to the hearsay rule is similarly not limited to prosecutions for conspiracy; it is a rule of evidence applicable to any offense. See *Id.* The court of appeals found that the statements were made neither "during the course" nor "in furtherance" of the conspiracy.

The State first attacks the court of appeals finding that the statements were not made "during the course" of the conspiracy. In so finding, that the statements were not made during the course of the conspiracy, the court reasoned that the State's evidence was insufficient to prove that any promised remuneration under the conspiracy due the accomplices was unpaid at the time the statements were made and therefore the conspiracy had terminated. The State, however, points to various post-murder payments received by McKee and McKee's wife to support its contention that the conspiracy was still ongoing at the time the statements were made. The State contends that these payments were part of the remuneration appellant had promised McKee for his part in the murder of Hutson. The State presented evidence that appellant, after the murder had occurred, told McKee that she would pay for his lawyer and help support his wife. The record reflects that the last money received by either Gail or Titus McKee was a payment of five hundred dollars mailed in an envelope postmarked May 2, 1986, just five days prior to the taping of the telephone call.[5] By all the foregoing evidence the

---

3. The complete recorded telephone conversation, as reported by the court of appeals, is set out in the appendix to this opinion.

4. We have thoroughly reviewed all the evidence presented in this cause. However, we have only included the more significant facts necessary to the resolution of the narrow ground of error for which discretionary review was granted. This opinion was not intended to, and in fact does not, include a recitation of all the evidence

presented in this cause. A more in-depth recitation of the intricate facts are set out in the court of appeals opinion.

5. The State also points to the fact that Sheffield was seen at the Oil Bowl, appellant's place of employment, soon after the telephone call was taped. The State contends that Sheffield went to the Oil Bowl to follow up on McKee's request to contact appellant in securing funds for bail and attorney's fees. However, Officers Smith

State contends that the conspiracy was still ongoing at the time telephone conversation was taped, and that the court of appeals erred by finding otherwise.

■ While the State's argument has some appeal we need not reach it since we cannot, in any event, reasonably find that McKee's conversation with Sheffield was "in furtherance" of the conspiracy. The Texas Rules of Criminal Evidence became effective September 1, 1986. The cases on which the State relies, predate the promulgation of the rules.[6] In cases decided before the effective date of the Rules of Evidence the "in furtherance" requirement of the "coconspirator rule" was either not recognized at all or if recognized, its interpretation was unsettled. See *Williams v. State*, 790 S.W.2d 643 (Tex.Cr.App.1990). However, this issue was settled in *Williams* where this Court held that the "in furtherance" of the conspiracy requirement of Rule 801(e)(2)(E) is a separate requirement that must be met in addition to the requirement that the statement be made "during the conspiracy." The proponent of the statement has the burden of showing, by a preponderance of the evidence, that the statement does in fact meet the requirements of Rule 801(e)(2)(E). See *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2779, 97 L.Ed.2d 144 (1987); *Ward v. State*, 657 S.W.2d 133, 136–137 (Tex.Cr.App.1983).

It is the State's contention that appellant agreed to pay McKee's attorney's fees and

bail if McKee were arrested and since Sheffield and McKee discussed attorney's fees and bail in the taped telephone conversation, the conversation was in furtherance of the conspiracy and thus admissible under Rule 801(e)(2)(E), supra. Appellant, on the other hand, contends that the statements were not made "in furtherance of" the conspiracy due to the fact that both Sheffield and McKee were cooperating with police at that time and that the statements were self-serving.

■ As we previously stated, the "in furtherance" of the conspiracy requirement of Rule 801(e)(2)(E) is a separate requirement that must be met in addition to the requirement that the statement be made "during the conspiracy." See *Williams v. State*, supra, (some substance must be given to the rule's requirement, not only that the statement was made "in the course" of the conspiracy, but also that it was made "in furtherance" thereof.) A conspiracy has been referred to as a partnership in crime; to-wit: "What one does pursuant to their common purpose, all do, and as declarations may be such acts, they are competent against all." See *Weinstein's Evidence*, Volume 4, p. 801–310, 1990.

■ In the present case, however, the statements were made to *frustrate* rather than further the common objectives of the conspiracy. Both participants in the telephone call, Ben Sheffield and Titus McKee, were working with law enforcement authorities at the time it was taped. Titus

and Anderson, who were at the Oil Bowl conducting surveillance on appellant, testified that although Sheffield was seen at the Oil Bowl, he was never observed talking with appellant. Nor did appellant respond in any fashion to McKee's request for assistance. It is unclear whether she was even aware of McKee's request. Moreover, during the taped conversation Sheffield failed to verify that the agreement included a promise of attorney's fees and bond. In fact Sheffield's only response was "I don't know, I can check you know" and "I can check."

6. The authorities the State relies on, that are on point to the disposition of this case, stand for the general proposition that "[A] conspiracy is not terminated until everything has been done that was contemplated to be done by the conspirators." See *Bates v. State*, 587 S.W.2d 121, 132 (Tex.Cr.App.1979); *Robbins v. State*, 134

Tex.Crim. 617, 117 S.W.2d 82 (1938) (a conspiracy includes everything that was within contemplation of the conspiracy, such as division of the spoils or any matter subsequent to, but include within, its scope); *Williams v. State*, 170 Tex. Crim. 595, 343 S.W.2d 263 (1961) (Stolen property and tools used in burglaries were admissible, where such items had been taken by officers from ditch where defendant and his coconspirator had hidden them after burglary); *Brown v. State*, 576 S.W.2d 36 (Tex.Cr.App.1978) (Although victim had been murdered, where conspirators had not received all their compensation, conspiracy was not finally terminated for purposes of applying rule that each statement or act of coconspirator up until the time the object of the conspiracy is completed is admissible).

McKee had been indicted for the capital murder of Hutson and had been in jail for five months. After spending five months in jail, McKee recanted his claims of noninvolvement in the murder and instead gave police a written confession which implicated appellant and Sheffield. McKee then agreed to place the telephone call which is at issue in this case for the specific purpose of eliciting statements from Sheffield that would implicate appellant. Moreover, Ben Sheffield was also cooperating with the police for the promise of a reduced sentence on his drug charge and in fact had turned McKee in to the police in the first instance. Sheffield had in fact testified against McKee at his examining trial.

Under the circumstances presented here it is clear that the statements made during the recorded telephone conversation neither advanced the cause of the conspiracy nor served in any way to facilitate the conspiracy. See *Deeb v. State,* No. 69,551 Slip Opinion p. 7 (Tex.Cr.App., June 26, 1991). It is equally clear that neither of the two alleged conspirators involved in this conversation were attempting to further any interests other than their own. See *United States v. Meacham,* 626 F.2d 503, 511 n. 8 (5th Cir.1980) (Where particular defendant's statements during recorded telephone calls were made not in furtherance of conspiracy but, rather, to assist in bringing coconspirator to justice or provide bogus defense in event of prosecution, such statements were not admissible under Fed.R.Evid. 801(d)(2)(E)); *United States v. Smith,* 578 F.2d 1227 (8th Cir.1978) (tape recording of conversation between two conspirators who were no longer members of the conspiracy should not have been admitted against third coconspirator); *United States v. Lang,* 589 F.2d 92 (2nd Cir.1978) (Taped conversation between undercover agent and witness that refused to testify at trial was not admissible against defendant

because statement could not be viewed as furthering conspiracy); *United States v. Kindle,* 925 F.2d 272 (8th Cir.1991) (Statements made to law enforcement officer after coconspirator's arrest were not in furtherance of conspiracy).[7]

Although we are not ruling that statements made by a conconspirator after arrest will necessarily be inadmissible, we find, under the facts of this case, that the conduct and interests of Ben Sheffield and Titus McKee were in such direct conflict with those of appellant, that the policies of Tex.R.Crim.Evid. 801(e)(2)(E) would not be furthered by admitting into evidence, against appellant, statements contained in the tape recorded conversation.

The court of appeals reversed the conviction because it was unable to conclude, beyond a reasonable doubt, that the error in admitting the telephone conversation made no contribution to appellant's conviction. The harm analysis made by the court of appeals is not assailed before this court. Accordingly, the judgment of the court of appeals is affirmed.

McCORMICK P.J., concurs in the result.

### APPENDIX

Unidentified: Hello.

Operator: Collect call from Titus McKee. Will you accept?

Unidentified: Yes, I'll accept.

McKee: Hello.

Unidentified: Hey.

McKee: How's it going?

Unidentified: Okay. You all right?

McKee: Yeah, I'm tired of sitting. You got Ben's phone number?

Unidentified: Ben?

McKee: Yeah.

Unidentified: Yeah. You want to talk to him?

McKee: Yea, I need to.

---

**7.** Cases interpreting the federal rules should be consulted for guidance as to their scope and applicability unless the Texas Rule clearly departs from its federal counterpart. See *Cole v. State* (Tex.Cr.App., No. 1179–87, Delivered November 14, 1990). Tex.R.Crim.Evid.

801(e)(2)(E) and Fed.R.Evid. 801(d)(2)(E) are worded identically. Federal cases interpreting this rule of evidence are particularly probative considering the large number of federal conspiracy cases and the limited number of Texas cases.

Unidentified: Just a minute. Ben. Believe it or not, he was just fixing to pull off, Titus.

McKee: Good.

Unidentified: Just fixing to pull off out there, outside there. What's going on?

McKee: Nothing much. Had a long sit ...

Unidentified: Shit, I hear you.

McKee: —sitting here a long time.

McKee: Yeah.

Sheffield: But do you know who paid, or what?

McKee: Yeah, it has been.

Sheffield: Huh?

McKee: Yeah, I brought that eleven hundred over there that night? For all that.

Sheffield: Well, I don't know. I'd see Dee and she if she's got them. I guess she's still got them. I don't even know. I ain't never paid no attention. I ain't never paid no attention.

McKee: Say, you don't think that somebody will make my bond, do you?

Sheffield: How much is your bond?

McKee: Well, it's at $100,000. right now.

Sheffield: Can't you get a lawyer and get it down?

McKee: Well, I don't know. I just wanted—I don't know how much I can get yet.

Sheffield: I'm talking about getting a lawyer and get the bond down.

McKee: Mine keeps on saying something about he won't do nothing until he knows I can get some money to get it down.

Sheffield: Who is your lawyer?

McKee: Kevin Settles.

Sheffield: (Inaudible)

McKee: You think that lady can do anything?

Sheffield: I don't know, I can check you know.

McKee: Yeah. I tried to call her a little while ago and couldn't get her.

Sheffield: I can check.

McKee: All right.

Sheffield: I can check. Where's Gail at?

McKee: Well, she's off somewhere right now.

Sheffield: Yeah.

McKee: She's scared.

Sheffield: She ain't coming to visit?

McKee: Huh-uh.

Sheffield: She visited you?

McKee: Not much. She's too scared.

Sheffield: I'll check on the rings and that other—

McKee: Man, I don't understand this. You know?

Sheffield: (Inaudible)

McKee: I don't know—what did you do me this way for, man?

Sheffield: Huh?

McKee: What did you do me this way for?

Sheffield: I ain't doing nothing. Like they say, when it gets tight, you've got to help your self. Maybe that's what you should do.

McKee: You're lucky he lied about it.

Unidentified: You ain't found nothing yet, or worked out nothing? Got anything concrete?

McKee: No, just waiting for the court, I guess.

Sheffield: Hello.

McKee: Say.

Sheffield: Hey.

McKee: What's going on.

Sheffield: Ain't nothing to it.

McKee: O. I was wondering about Gail's rings.

Sheffield: Huh?

McKee: I was wondering about Gail's rings.

Sheffield: What about them?

McKee: Yeah.

Sheffield: Well, I don't know. I guess they've still got them, I guess.

McKee: Where can I get them from?

Sheffield: Huh?

McKee: Where can I get them from?

Sheffield: Where can I get them from them?

McKee: Yeah. And how?

Sheffield: How much was there? I don't even know how much was it.

McKee: It's already paid.

Sheffield: What's already paid?

McKee: Set of rings.

Sheffield: Oh, yeah?

Sheffield: That ain't lying. If you remember out there, I'd say if you did out there, you'd know. If you're thinking right.

McKee: Do what?

Sheffield: I say, if your thinking right.

McKee: Yeah, but see, I couldn't blame it on somebody else, like your talking about.

Sheffield: Well, tell them who operated.

McKee: Huh?

Sheffield: Tell them who did it.

McKee: Tell them who did it? Then I'd be setting myself up.

Sheffield: What do you mean you'll be setting yourself up? You won't be setting yourself up.

McKee: Otherwise, I'd be putting something on somebody that don't deserve it.

Sheffield: If they did it, they deserve it God damn it. To save yourself. Shit, you know how that go.

McKee: Well, as far as that goes, you know you kind of set it up, you know.

Sheffield: No, I ain't did nothing.

McKee: Well, you just talk to the lady for me and see if I can't do something.

Sheffield: I'll see.

McKee: I need to get a hold of her, but I can't get a hold of her. I tried to call out there, and they won't accept the call.

Sheffield: Uh-huh. I ain't saying that I can go out there and play cool and sit. I can't. Shit. Horses out running now.

McKee: Well I can't stay here. I don't want to stay in all this, you know. You all just leave me hang out to dry. I'm going to have to go pretty quick, man. The time is fixing to run out on the phone. And I'd appreciate you all thinking about it, talking about it, something.

Sheffield: Well, I'll check and see what's happening.

McKee: I need to.

Sheffield: All right.

McKee: Bye.